*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
GASTON, HOUTZ, and MYERS
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Connor J. MURPHY**
Lance Corporal (E-3), U.S. Marine Corps
*Appellant*

**No. 202000233**

Decided: 17 February 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
K. Scott Woodard (arraignment)
Keaton H. Harrell (motions, trial)

Sentence adjudged 19 June 2020 by a general court-martial convened at Marine Corps Base Camp Lejeune, North Carolina, consisting of officer and enlisted members. Sentence in the Entry of Judgment: reduction to E-1, confinement for six months, forfeiture of all pay and allowances, and a bad conduct discharge.

For Appellant:
*Lieutenant Commander Christopher K. Riedel, JAGC, USN*

For Appellee:
*Lieutenant R. Blake Royall, JAGC, USN*
*Lieutenant Gregory A. Rustico, JAGC, USN*

Judge HOUTZ delivered the opinion of the Court, in which Senior Judge GASTON and Judge MYERS joined.

_____

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

_____

HOUTZ, Judge:

Appellant was convicted, contrary to his pleas, of one specification of abusive sexual contact by bodily harm in violation of Article 120, Uniform Code of Military Justice [UCMJ],[1] for touching the genitalia of his sister-in-law, Ms. Sierra,[2] without her consent.

In his sole assignment of error, Appellant asserts the evidence is factually insufficient to support his conviction. After careful consideration of the record of trial and the pleadings of the parties, we find the evidence factually insufficient and set aside the findings and sentence.

## I. BACKGROUND

The circumstances that led to Appellant's conviction arise from allegations by Ms. Sierra, who moved in with Appellant and his wife, Mrs. Mike (Ms. Sierra's identical twin sister), in June 2017. The three of them first resided in an off-base apartment in Jacksonville, North Carolina, and in September 2017 moved into base housing on Camp Lejeune.

About four months after moving on base, Ms. Sierra and her boyfriend, Mr. Charlie, went to the Jacksonville Police Department [JPD] and reported several incidents that Ms. Sierra said occurred while she was living with Appellant and her sister. A patrol officer from JPD, Officer Romeo, took the initial report and interviewed Ms. Sierra, who alleged that while living off base Appellant had on separate occasions smacked her buttocks, touched her thigh, made her touch his penis, massaged her back, touched her breasts and stomach, and attempted to strangle her in a car. She also alleged that a few weeks after moving on base, Appellant had lain down between her and her sister, put

_____

[1] 10 U.S.C. § 920 (2016).

[2] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

a blanket on her thigh, and "tried to discretely touch my thigh but I got up and told him if he touched me again I was going to kill him and I left the room."[3]

Eight days later, Ms. Sierra was interviewed again by an investigator from JPD assigned to investigate the report made to Officer Romeo. During that interview, Ms. Sierra recounted her allegations against Appellant that occurred while they were living on and off base. Ms. Sierra told the investigator that during the on-base incident Appellant had lain down between her and her sister and "grabbed her inner thigh."[4]

A few months later, Ms. Sierra was interviewed by an agent with the Naval Criminal Investigative Service [NCIS]. During that interview, Ms. Sierra told the agent that during the on-base incident, Appellant had climbed onto the bed between the sisters and touched her "vaginal area" on top of her shorts.[5] That same day, the NCIS agent interviewed Mrs. Mike, who said that "she never saw anything inappropriate occur" between Appellant and Ms. Sierra and that Ms. Sierra "lies a lot."[6]

Ultimately, all of the allegations were charged, investigated at a preliminary hearing under Article 32, UCMJ, and referred to trial by general court-martial. At trial, Appellant was acquitted of every offense except for the specification of abusive sexual contact alleging he "touch[ed], directly or through the clothing, the genitalia of [Ms. Sierra]" without her consent. The prosecution's evidence consisted of the testimony of the two sisters, Mr. Charlie, and two pages from Appellant's administrative records. The Defense called as a witness Officer Romeo, the JPD patrol officer who took the initial report from Ms. Sierra.

**A. Ms. Sierra's Testimony**

Ms. Sierra testified that shortly after she moved in with Appellant and her sister in June 2017, she became romantically involved with a Marine, Mr. Charlie, who then deployed from July 2017 until December 2017. She testified that she told Mr. Charlie about the incidents involving Appellant while he was deployed. When he returned from deployment, she moved in with him and together they reported the incidents to JPD. She acknowledged that during her initial interview with JPD she needed help remembering details about

---

[3] App. Ex. VII at 16.

[4] *Id.* at 19.

[5] *Id.* at 21.

[6] App. Ex. VI at 32.

the incidents from Mr. Charlie—whom she married three weeks later—and that she giggled throughout the second interview with JPD.

Regarding the incident for which Appellant was convicted, Ms. Sierra testified that one afternoon she was lying in bed with her sister, who was eight months' pregnant and asleep, and Appellant was playing video games on the floor. She testified that Appellant stood up, got in the bed between her and her sister, threw a blanket over Ms. Sierra, and "hit her leg."[7] She testified that when he hit her leg, she pushed the blanket off and he threw it back over her. She testified that she then "felt his hand trying to creep from underneath the blanket to get to, like, my vagina area."[8] When asked whether Appellant "ever [got] to [her] vagina area," she replied, "Just on top of, like, my clothing."[9] The trial counsel then asked, "Now when [Appellant] touched your vagina over your clothes with your sister sleeping right there beside you, how did that make you feel?"[10] Ms. Sierra responded, "I was mad. I was really upset about it."[11] She testified that at that point she threw off the blanket, hit her hand on a table which woke up Mrs. Mike, told Mrs. Mike to "control her husband," and walked out of the room.[12]

**B. Mrs. Mike's Testimony**

Mrs. Mike testified that she had lied to NCIS, the Defense team, and the prosecutors when she said that she was unaware of the alleged incidents and that Ms. Sierra lied a lot. She explained that she lied because of her relationship with Appellant and because she relied on his financial support for the care of their child and herself. She testified that she and Appellant had since separated and were in the process of getting a divorce.

Regarding the on-base touching incident, Mrs. Mike testified that one afternoon she and Ms. Sierra were lying down when Appellant got into the bed between them. She testified,

> I was, like, just waking up from a nap and I was feeling super
> nauseous and [Ms. Sierra] had brought me Sprite and some

---

[7] R. at 263.

[8] *Id.*

[9] *Id.*

[10] *Id.* at 264.

[11] *Id.*

[12] *Id.*

crackers and we were laying down together. It was like, me, [Ms. Sierra], [and Appellant,] and I turned and [Appellant] was rubbing [Ms. Sierra's] hip area and, like, as soon as [Appellant] touched her, [Ms. Sierra] was like, f[***] no. You're not doing that and hopped up and just walked outside.[13]

When asked, "Could you describe how he reached and touched her?" Mrs. Mike responded, "Like, around her and toward her vagina."[14]

On cross-examination, Mrs. Mike testified that when she entered her kitchen in July 2017, she observed Ms. Sierra seated on the kitchen counter with a shirtless Appellant standing between her legs.

## C. Mr. Charlie's Testimony

Mr. Charlie testified that he began dating Mrs. Sierra in June 2017 and that she texted him about one of the incidents with Appellant in July 2017. He testified that after he returned from deployment in December 2017, Ms. Sierra told him about the "last instance" and "then we decided to go report it."[15]

## D. Officer Romeo's Testimony

Officer Romeo, who took the initial report from Ms. Sierra and Mr. Charlie in January 2018, testified as follows about his observations from the interview:

> During the initial verbal portion, Ms. [Sierra] was very confused, very uncertain of her facts and circumstances. Mr. [Charlie] kept prompting her, saying, "you told me this, you told me that" throughout the course of the interview. And she was very, for a lack of a better term, wish-washy in her details.[16]

Officer Romeo then went to speak to his desk sergeant, leaving Ms. Sierra and Mr. Charlie alone together in the interview room. He testified that when he returned 10-15 minutes later, Ms. Sierra "seemed very confident of her facts and circumstances."[17]

---

[13] *Id.* at 403.

[14] *Id.* at 404.

[15] *Id.* at 358

[16] *Id.* at 478.

[17] *Id.* at 479.

## II. Discussion

### A. Standard of Review and the Law

We review claims of factual sufficiency de novo.[18] The "awesome, plenary, de novo power" of factual sufficiency review requires this Court to weigh all the admitted evidence and testimony at trial, make "allowances for not having personally observed the witnesses," and decide whether it is convinced of the accused's guilt beyond a reasonable doubt.[19] While this Court must account for not seeing the witnesses' demeanor, it does not mean the Court must abandon logic and common sense in conducting its review. This Court may independently judge the credibility of the witnesses at trial, resolve questions of fact, and substitute its judgment for that of the military judge or the court-martial members.[20] In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[21]

Reasonable doubt "is not a fanciful, speculative, or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in the case."[22] Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict."[23] "It is a genuine misgiving caused by insufficiency of proof of guilt. Reasonable doubt is a fair and rational doubt based upon reason and common sense and arising from the state of the evidence."[24]

In order to sustain Appellant's conviction for abusive sexual contact as charged, the Government must have proven beyond a reasonable doubt that: (1) Appellant committed sexual contact upon Ms. Sierra by touching, directly or through the clothing, her genitalia; (2) he did so by causing bodily harm to

---

[18] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[19] *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

[20] *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990).

[21] *Washington*, 57 M.J. at 399.

[22] *United States v. Rendon*, 75 M.J. 908, 911–12 (N-M. Ct. Crim. App. 2016) (quoting military judge's instruction and finding no error).

[23] *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

[24] *Rendon*, 75 M.J. at 911.

her; and (3) he did so with the intent to abuse, humiliate, or degrade Ms. Sierra or to arouse or gratify the sexual desire of any person.[25] "The term 'sexual contact' means touching, or causing another person to touch, either directly or through the clothing, the genitalia, anus, groin, breast, inner thigh, or buttocks of any person, with an intent to abuse, humiliate or degrade any person; or any touching, or causing another person to touch, either directly or through the clothing, any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person."[26] "The term 'bodily harm' means any offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact."[27]

### B. Analysis

The manner in which this case was prosecuted invites more questions than were answered regarding this particular offense, and causes this Court to find the evidence insufficient to support a conviction. Appellant's conviction for abusive sexual contact essentially rests on the testimony of Ms. Sierra and Mrs. Mike, which is conflicting in a number of material areas and also presents significant credibility issues. We are therefore not convinced beyond a reasonable doubt that Appellant committed abusive sexual contact upon Ms. Sierra by touching, directly or through the clothing, her genitalia.

The Government focused most of its direct examination of Ms. Sierra on the off-base incidents of which Appellant was acquitted. Her testimony about the on-base touching incident for which Appellant was convicted was both brief and ambiguous. She testified that she "felt his hand *trying* to creep from underneath the blanket to get to, like, [her] vagina area."[28] When asked whether Appellant actually "ever [got] to [her] vagina area," she replied, "Just on top of, like, my clothing."[29] It is unclear what Ms. Sierra's understanding of "vagina area" is, which was not clarified through further questioning. Such ambiguity might have been resolved had Ms. Sierra been questioned, for example, about whether "vagina area" includes or excludes the "groin" area, which our sister

---

[25] *Manual for Courts-Martial, United States* (2016 ed.) [*MCM*], pt. IV, para. 45.b.(7)(b) at IV-72.

[26] Article 120(g)(2), UCMJ, 10 U.S.C. § 920(g)(2) (2016).

[27] Article 120(g)(3), UCMJ, 10 U.S.C. § 920(g)(3) (2016).

[28] R. at 263 (emphasis added).

[29] *Id.*

court has held is materially different from the "genitalia."[30] Her only other testimony regarding the sexual contact was "I was mad. I was really upset about it" in response to a suggestive question from the trial counsel asking how she felt when Appellant touched her vagina over her clothes with her sister sleeping right there. The adoptive way in which this testimony was elicited, coupled with the lack of critical detail about what the term it uses actually means, leaves us with doubt as to whether Appellant in fact touched Ms. Sierra's genitalia over her clothing, whether he touched her groin area, or whether he simply touched her clothing on the way to, or in the vicinity of, her vaginal area.[31]

When we factor in Mrs. Mike's testimony, we are even more uncertain about what occurred. We disagree with the Government's contention that Mrs. Mike corroborated each essential element of the offense. To the contrary, her testimony was that Ms. Sierra got up and left after Appellant rubbed Ms. Sierra's "hip area."[32] She never testified that she saw contact with the genital area, and a fair interpretation of her testimony is that Appellant only touched Ms. Sierra's hip over the clothing, not her genitalia. Mrs. Mike's testimony also conflicts with Ms. Sierra's testimony in other material ways, such as that the incident occurred under a blanket, that Ms. Sierra struck a table in frustration when she got up from the bed, and that Ms. Sierra told her sister "to control her husband," none of which were mentioned in Mrs. Mike's testimony. While there may be reasonable explanations for these and other discrepancies,[33] no

---

[30] *See United States v. Perez*, No. ARMY 20140177, 2016 CCA LEXIS 131, \*5 (Army Ct. Crim. App. Feb. 29, 2016) (unpublished).

[31] The Government appears to have shared this uncertainty, as the trial counsel in his opening statement referred to this incident as an "attempt." R. at 238 ("Finally, Mrs. [Sierra] will describe an incident where she and her twin sister where [lying] in bed together and the accused entered the bedroom, [lay] next to her, and *attempted* to reach over her thigh and touch her vagina.") (emphasis added).

[32] R. at 403 ("Connor was rubbing [Ms. Sierra's] *hip area* and, like, as soon as Connor touched her, [Ms. Sierra] was like, f[\*\*\*] no. You're not doing that and hopped up and just walked outside.") (emphasis added). When asked a second time how Appellant touched Ms. Sierra, Mrs. Mike testified it was "[l]ike, around her and *toward* her vagina" before Ms. Sierra "said, 'f[\*\*\*] no. You're not doing that.' And immediately hopped up." R. at 404 (emphasis added).

[33] Mrs. Mike also testified about overhearing a purported "confession" that Appellant made during a phone call with Mrs. Mike's father; however, based on the record this discussion concerned a separate alleged offense, of which Appellant was acquitted,

such explanations were offered at trial, and we must review each case only based on the evidence before us. We find that, in light of the ambiguity already present in Ms. Sierra's testimony, Mrs. Mike's testimony creates reasonable doubt.

This doubt is magnified when we consider the testimony of Officer Romeo, to whom Ms. Sierra made no mention of Appellant touching her genitalia, over the clothes or otherwise. He testified that when he interviewed Ms. Sierra approximately four months after the incident, Ms. Sierra giggled throughout the interview, was "wishy-washy," and "uncertain in her facts." She appeared to rely on Mr. Charlie, who did not witness any of the incidents, to help her with the details. The Court recognizes that victims may experience strong emotions under the stress of talking with investigators about crimes committed against them, and that Ms. Sierra's behavior may not be unusual. However, the manner in which she responded to questions from both trial and defense counsel, combined with the behavior she displayed to Officer Romeo when providing her initial statement to JPD, leaves this Court with more questions than were answered at trial. The trial counsel made no attempt either to clarify the testimony or to explain this behavior. Given this context, the evidence presented at trial leaves us uncertain about what exactly occurred and thus whether the elements of the charged offense are satisfied.[34]

After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are not convinced of Appellant's guilt beyond a reasonable doubt. We therefore find the evidence factually insufficient to support his conviction.

## III. CONCLUSION

The findings and sentence are **SET ASIDE**. The charge is **DISMISSED WITH PREJUDICE**. All rights, privileges, and property of which Appellant has been deprived due to the finding and sentence are ordered restored.[35]

Senior Judge GASTON and Judge MYERS concur.

---

that he had caused Ms. Sierra to touch his penis without her consent. *See* R. at 411, 429.

[34] This Court also considered whether the elements for any lesser-included offenses were proven beyond a reasonable doubt and arrived at the same conclusion based upon our review of the record.

[35] Articles 58b(c) & 75(a), UCMJ.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court